**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **DEREK OSEI-ASSIBEY** <br> *Plaintiff* | : <br> : <br> : | **CASE ACTION NO.** <br> <br> **3:20-cv-01911-VAB** |
| **V.** | : <br> : | |
| **STOP & SHOP SUPERMARKET CO LLC** <br> *Defendant* | : <br> : <br> : | **JULY 25, 2023** |

**PLAINTIFF'S PROPOSED FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW**

Plaintiff, Derek Osei-Assibey ("Plaintiff"), Pursuant to the Standing Order Regarding Trial Memoranda in Civil Cases, submits these Proposed Findings of Fact and Conclusions of Law.

**I.     PROPOSED FINDINGS OF FACT**

1. Stop & Shop hired Osei-Assibey as a full-time Customer Service Manager in the Newington, Connecticut store on or about October 17, 2016.

2. At the time of his hire, Plaintiff's name was Kwame Sekyere. Plaintiff changed his named to Dereck Osei-Assibey in or around 2017 when he became a United States citizen.

3. The Customer Service Manager is one of three "Associate Store Manager" level positions. The other Assistant Store Managers include the Perishable Manager and the Non-Perishable Manager.

4. As a Customer Service Manager, Osei-Assibey was responsible for managing the recruiting, hiring, and training of new associates and overseeing the front-end, cash office, and customer service operations.

5. Osei-Assibey remained a Customer Service Manager throughout his employment at Stop & Shop.

6. At the time of his termination, Osei-Assibey reported directly to Store Manager, Marsheila Spruiell. Brian Betesh was the District Director.

7. In October of 2017, the Newington Store received a customer complaint concerning Rebecca "Becky" Rossignol, wherein the customer complained that:

> …Becky accused her of committing fraud - cust had a $2 P&G cpn for Tide – cust spoke with the SM who xplnd the store was informed these cpns were not valid - cust is not pleased that Becky accused of her committing fraud - she says Becky was rude and had an attitude – she mentioned informing the mgr of this and telling him she would be calling corp - cust is not satisfied and says if no one calls her in 24 hours she will call back. *Ex. 502*.

8. The following day, the Newington Store received a similar complaint regarding the same incident, which, like the preceding complaint, the customer focused her concerns on the female associate's handling of the issue:

> [I] put 4 items in my cart when all of a sudden we here this lady telling to us from across the market asking us if we were going to use a certain coupon for that particular item she then told us because if you are we are not accepting that coupon she was so loud rude and very unprofessional her name was Laura we then askes her to call a manager which she yelled again to the customer service girl to call the manager not leaving our sight the manager came over atrd his name was kwame he came over we explain to hirn our concern that this lady was just very rude and he continued to tell us that coorporate office had text him a picture of the coupon we weren't suppost to use and a bunch of nonsense…. *Ex. 502*.

9. During the course of the foregoing exchange, wherein Plaintiff had intervened in an attempt to resolve the customer's issue, Plaintiff gestured with his hand toward an endcap display.

10. The customer did not complain about Plaintiff's non-verbal communication.

11. Store Manager Jennifer Mohlein nonetheless counseled Plaintiff that he should be aware of nonverbal communication, but no formal discipline was issued. *Ex. 502*.

12. In or about November 2018, Defendant received a "tip line" complaint from an associate concerning Plaintiff, whom Plaintiff had recently attempted to hold accountable for not performing her work. Defendant did not substantiate the associate's concerns. *Ex. 2* at p. 2.

13. In or about June, 2019, Rob Moritko, Mike Mignola, and Andrew Dinallo met with Plaintiff to discuss a store walk which had occurred on a recent weekend shift—the Newington Store's busiest shifts. On the date and time of the anticipated store walk with Mr. Dinallo, associates were in the process of stocking inventory, and Plaintiff had a scheduled interview with a new candidate, and Plaintiff was the only manager in the store at the time Accordingly, Plaintiff requested that Mr. Dinallo hasten up the store walk so that he could attend to his other obligations in the store. Mr. Dinallo reported to the district manager that Plaintiff was not receptive to feedback during the walk. In the course of the ensuing meeting, Plaintiff explained his perspective, and Defendant did not inform Plaintiff that he would be issued any form of corrective action in connection with the store walk or his interactions with Dinallo.

14. In July of 2019 Defendant Store Manager Tony Mendes edited Plaintiff's timecard to delete a shift which had previously been approved as payable by Defendant's district manager, despite Mendes being aware that the additional pay for Plaintiff having worked a double shift had been approved. Upon being notified that Medes had altered

3

Plaintiff's timecard, resulting in Plaintiff's pay having been docked for the shift, Plaintiff sent a series of texts to Medes, wherein he wrote:

> I worked Monday Tuesday Wednesday I took a ph on Saturday 2613 was supposed to pay me for Friday and I was supposed to get paid for the holiday….you were not supposed to edit by timecard….that is against the policy…Don't touch my timecard again ever….Please don't use the word time out when I am speaking to you we are not in kindergarten. You better fix it…they were supposed to pay me for six days they paid me only 5…what you said is wrong….I have seen people get paid 6 days on holiday week… *Ex. 3*

15. On August 7, 2019, Rob Moritko, Defendant's human resources business partner, spoke with Plaintiff concerning his recent interactions with Mendes. During the course of the exchange, Plaintiff complained to Moritko concerning the fact that Mendes had made the comment "Africans are very aggressive."

16. On September 26, 2019, Defendant issued Plaintiff a "final warning" in connection with his exchange with Mendes related to Mendes having edited Plaintiff's timecard, wherein it characterized Plaintiff as having not "ma[d]e a good decision or us[ed] good judgment when he sent an inappropriate text message to his direct supervisor[.]" *Ex. 5*.

17. Shortly after Defendant issued Plaintiff the September 26, 2019 warning, Plaintiff was transferred to Store 628 in Bristol, Connecticut, related to Plaintiff's ongoing requests for accommodation and a 5-day workweek.

18. Plaintiff remained a Customer Service Manager following the transfer to Store 628.

19. Plaintiff was assigned a rating of "2" (partially meets expectations) on his annual performance appraisals for 2016, 2017, and 2018.

20. In April of 2018, Defendant placed Plaintiff on a "Performance Improvement Plan," ("PIP"), *Ex. 508*, but shortly thereafter took Plaintiff off of the plan on account of Plaintiff not having been trained on a number of items called out in the PIP.

21. Plaintiff performed at or above satisfactory levels between the Spring of 2018 and February 2020.

22. On February 7, 2020, Store Manager Marsheila Spruiell e-mailed District Director Brian Betesh and Human Resources Business Partner Julio Colón regarding an incident that had occurred the day before (February 6) involving Plaintiff.

23. In the email, Spruiell requested a meeting with HR and reported that Plaintiff had "called the store at approx[imately] 11:55pm and asked [Lakeisha Gary] if Gail [Aldrich, Perishable Manager] was still working[.]" Spruiell further reported that Plaintiff was complaining because he "work[s his] shifts until midnight [and that] she's suppose[d] to work hers[.]" Spruiell further reported that Plaintiff conveyed his intent to contact Brian Betesh, Defendant's District Director. *Ex. 06*.

24. During Plaintiff's conversation with Ms. Gary on the evening of February 6, 2020, Plaintiff inquired as to whether Sprueill had allowed Ms. Aldrich to leave her shift early, and conveyed that it was unfair that Plaintiff was routinely forced to work through midnight while Aldrich was not.

25. Plaintiff met with Julio Colon on February 7, 2020 to discuss Spruiell's concerns as outlined in her email from that morning. During the course of the ensuing meeting, Colon stated to Plaintiff that he did not understand why Plaintiff cannot live in peace with Ms. Spruiell. In response, Plaintiff conveyed that there is a lot going on, but that he was afraid to share his concerns out of fear of retaliation. Colon, in response,

assured Plaintiff that there would be no retaliation because retaliation is illegal and against the law.

26. During the course of the ensuing dialogue, and in reliance on Colon's representations that Plaintiff would not be subjected to retaliation for raising his concerns, Plaintiff relayed that he believed Spruiell was discriminating against him and treating female employees like Aldrich more favorably by letting them leave their scheduled shifts early, whereas he was typically required to complete his entire shift through to midnight. Plaintiff further relayed that there had been an incident wherein he had hired a pregnant candidate for a position, and Spruiell's response was to ask why Plaintiff had hired her, specifically inquiring of him "Didn't you know she was pregnant?" Plaintiff further relayed that he had informed Spruiell that it was illegal to discriminate against Pregnant women, stating, "You cannot decide not to hire someone based on the fact that she's pregnant." Plaintiff further relayed that Spruiell was "very, very upset." During the course of the discussion with Colon on February 7, 2020, Plaintiff further relayed to Colon that he had received multiple complaints from other associates concerning Spruiell's conduct.

27. Following the meeting, Osei-Assibey provided Colón with a list of dates on which he believed the Night Crew Chief had begun working at 10 p.m. and stated that "if [the Night Crew Chief] came in so Gail could leave early. . . that is not fair and consistent."

28. Colón e-mailed Spruiell the list of dates the Night Crew Chief allegedly began his shift at 10 p.m. that Osei-Assibey provided and inquired if Aldrich had left early on those dates and, if so, for what reason.

29. Sprueill confirmed that on "the night in question she [Alrdich] left at 9:45 with my permission." In the remainder of her email, Spruiell did not answer Colon's question

directly, and instead, conveyed that "When my night crew chief( frozen food) comes in early, it isn't for my exempt team to leave. It is a business decision[,]" and provided some examples of what she characterized as examples of those business decisions. *Ex. 8*.

30. In connection with his investigation of Plaintiff's complaints concerning Sprueill, Colon learned that one individual characterized Sprueill as a "girl boss," and confirmed that she had relayed to Plaintiff that she had an "issue…with Marsheila…over Sunday hours on one specific Sunday."

31. On March 20, 2020, Colon and Betesh met with Plaintiff in order to issue him a warning for what Defendant characterized as him failing "use good judgment when he made inappropriate comments to a trainee regarding his store manager [Sprueill] on Thursday, 2/6/2020[, and engaging] in unprofessional conduct by soliciting negative feedback from associates regarding his store manager."

32. When Colon presented Plaintiff with the warning, Plaintiff became upset on account of the fact that Colon had previously represented to Plaintiff that there would be no retaliation against Plaintiff for raising concerns with Sprueill, and Colon had, in response to Plaintiff apprising him of his concerns regarding Spruiell, issued Plaintiff a final warning. During the course of the exchange, Plaintiff conveyed to Colon, in sum and substance, that he had given his word to Plaintiff that he would not be disciplined on account of raising concerns about Sprueill. Plaintiff further conveyed that the warning he was being issued was itself retaliatory, and directly contrary to the representations Colon had made in the preceding February 7, 2020 meeting. In protest, Plaintiff ripped up the warning, and conveyed he needed to leave the room to cool down. Colon then instructed Plaintiff to turn in his keys and leave. Plaintiff turned in his keys, and left.

33. Defendant terminated Plaintiff effective March 31, 2020, in the midst of the early days of the COVID-19 pandemic. *Ex. 11*.

34. Plaintiff's opposition to discriminatory, retaliatory, and unlawful employment practices constituted a motivating factor in Defendant's decision to terminate his employment.

35. Plaintiff engaged in reasonable efforts, in light of the totality of the circumstances, to become re-employed following his termination by Defendant.

36. Plaintiff remained out of work through January 3, 2022, at which point he became re-employed with Amazon.com, earning a higher rate of pay than he had earned while employed with Defendant.

37. Plaintiff earned an average weekly wage of $1,187.67 while employed with Defendant.

38. Plaintiff's lost wages between March 31, 2020 and January 3, 2022 equate to $109,095.97.

39. Plaintiff sustained emotional distress damages as a result of the termination of his employment.

## II.   CONCLUSIONS OF LAW

1. Plaintiff's complaints to Colon constituted protected activity within the meaning of the Connecticut Fair Employment Practices Act.

2. Plaintiff's protected activity was a motivating factor in Defendant's decision to terminate his employment.

3. Plaintiff has met his burden of proof concerning his entitlement to economic and non-economic damages.

                PLAINTIFF,
                DEREK OSEI-ASSIBEY

BY:  _____
                Matthew D. Paradisi (CT29915)
                Cicchiello & Cicchiello, LLP
                364 Franklin Avenue
                Hartford, CT 06114
                Phone:  860-296-3457
                Fax:  860-296-0676
                Email:  mparadisi@cicchielloesq.com

**CERTIFICATION**

    I hereby certify that on July 25, 2023, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

By:_____
Matthew D. Paradisi, Esq. (CT29915)